PILLSBURY WINTHROP SHAW
PITTMAN LLP
Hugh M. Ray, III (*pro hac vice*)
hugh.ray@pillsburylaw.com
609 Main Street, Suite 2000
Houston, Texas 77002
Telephone: 713-276-7600
*General Counsel for Peter J. Mastan,*
*Chapter 7 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>Moto Holding, LLC<br>Motolease Servicing, LLC<br>Motolease Funding, LLC<br>Pico Mobility, LLC<br>Westwood Group LLC<br>M-Nation, LLC<br>MotoLease Titling Trust II<br><br>Debtors.<br><br>Affected Debtor(s):<br><br>☒ All Debtors<br>☐ Moto Holding, LLC<br>☐ Motolease Servicing, LLC<br>☐ Motolease Funding, LLC<br>☐ Pico Mobility, LLC<br>☐ Westwood Group LLC<br>☐ M-Nation, LLC<br>☐ MotoLease Titling Trust II | Lead Case No. 2:24-bk-16517-BB<br>(Chapter 7)<br><br>Jointly Administered with:<br>2:24-bk-16519-BB; 2:24-bk-16520-BB;<br>2:24-bk-16521-BB; 2:24-bk-16522-BB;<br>2:24-bk-16523-BB; 2:24-bk-18137-BB<br><br>**NOTICE OF MOTION AND TRUSTEE'S RULE 9019 MOTION FOR APPROVAL OF SETTLEMENT WITH MAURICE SALTER, THE SALTER FAMILY TRUST, ALADDIN TWO, LLC, EMRE UCER, AND UCER, LLC; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS AND EXHIBITS**<br><br>**[No Hearing to Be Set Unless Requested Pursuant to LBR 9013-1]** |

## NOTICE OF MOTION AND MOTION

**TO THE HONORABLE SHERI A. BLUEBOND, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; ALL SCHEDULED CREDITORS OF THE CONSOLIDATED ESTATES AND THOSE WHO HAVE FILED PROOFS OF CLAIM; AND THEIR RESPECTIVE COUNSEL OF RECORD, IF ANY:**

**PLEASE TAKE NOTICE** that Peter J. Mastan, in his capacity as trustee (the "Trustee") of the jointly administered and substantively consolidated chapter 7 estates (the "Estates") of Moto Holding, LLC; Motolease Servicing, LLC; Motolease Funding, LLC; Pico Mobility, LLC; Westwood Group LLC; M-Nation, LLC; and MotoLease Titling Trust II (collectively, the "Debtors") in the above-captioned bankruptcy cases hereby files this *Rule 9019 Motion for Approval of Settlement with Maurice Salter, the Salter Family Trust, Aladdin Two, LLC, Emre Ucer, and Ucer, LLC* (the "Motion").

Through the Motion, the Trustee seeks an order:

(i) Granting the Motion;

(ii) Approving the terms and conditions of the Settlement Agreement and Mutual Release (the "Agreement"),[1] attached as **Exhibit 1**, between the Trustee, on behalf of the Estates, and MBL Administrative Agent II LLC ("MBL," and together with the Trustee, the "Plaintiffs"), on the one hand, and Maurice Salter, individually and as trustee of the Salter Family Trust, Aladdin Two, LLC, Emre Ucer, individually, and Ucer, LLC (collectively, the "Defendants"), on the other hand;

(iii) Authorizing the Trustee to settle with the Defendants on the terms set forth in the Agreement;

(iv) Determining that the Agreement was made in good faith in an arm's-length transaction;

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Agreement.

(v) Authorizing the Parties to perform the terms of the Agreement, including the releases contemplated by the Agreement;

(vi) Authorizing the Trustee to receive, retain, and apply the Settlement Payments provided under the Agreement, including the $1.5 million Initial Payment from proceeds of the Chantilly Property;

(vii) Providing that, in the event of a Payment Default, the Plaintiffs may, on an *ex parte* basis, lodge the Payment Default Stipulated Judgment for entry by the Court in the adversary proceeding styled *MBL Administrative Agent II LLC, et al. v. Salter, et al.*, Adv. Proc. No. 2:25-ap-01207-BB (the "Adversary Proceeding");

(viii) Approving the Pre-Hearing Schedule Delivery Default provisions of the Agreement, including the Trustee's right, upon such default and subject to the terms of the Agreement, to retain and apply the $1.5 million from the Chantilly Property sale proceeds without filing a Default Motion and without entry of any Stipulated Judgment;

(ix) Approving the procedures for determining, as a contested matter, whether a Covenant Event of Default or a Representation and Warranty Event of Default has occurred and for seeking entry of the Covenant Default Stipulated Judgment or the Representation and Warranty Default Stipulated Judgment;

(x) Approving the financial disclosure, account-access, reporting, pledge, lien, perfection, limited spousal consent, and related security provisions set forth in the Agreement, including the self-executing effect of the Approval Order as provided in Article VIII of the Agreement;

(xi) Approving the treatment of the stipulated facts declarations attached as Exhibits C and D to the Agreement, including the non-public treatment of such declarations unless and until an Event of Default has occurred, subject to the terms of the Agreement;

(xii) Approving the Agreement's provisions regarding the pending appeal of the order approving the Trustee's settlement with MBL, the dissolution of the preliminary injunction upon the Effective Date, the dismissal of related state-court actions, and the eventual dismissal of the Adversary Proceeding in accordance with Article XIV of the Agreement;

(xiii) Providing that, in the event the Defendants have fully satisfied all obligations under the Agreement, Plaintiffs shall file a dismissal of the Adversary Proceeding with prejudice within 30 days after expiration of the Deadline to Pursue a Stipulated Judgment;

(xiv) Providing that, the released claims against the Estates shall not be entitled to allowance or distribution and shall be deemed formally withdrawn upon satisfaction of all obligations under the Agreement;

(xv) Providing that, the proposed settlement is binding on all creditors of the Estates who received notice of the Motion such that they are prohibited from asserting in their own right any claims held by the Estates that are released under the Agreement; and

(xvi) Determining that adequate notice of the Motion was given.

**PLEASE TAKE FURTHER NOTICE** that the Motion is made pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") on the grounds that the proposed settlement is in the best interests of the Estates. The Trustee contends that the Defendants are liable to the Estates for, among other things, avoidance and recovery of fraudulent transfers, breach of fiduciary duty, and civil conspiracy. The Defendants dispute the Trustee's contentions and instead assert that the Estates owe money to the Defendants as set forth in their proofs of claim and otherwise. The Trustee disputes those contentions and denies that the Estates owe Defendants any amount. The proposed settlement resulted from mediation before the Honorable Lee R. Bogdanoff (Ret.).

Subject to Court approval, and on the terms set forth in the Agreement, the Parties

are settling their respective disputes and exchanging releases. Pursuant to the Agreement, the Defendants will (i) pay the Estates a total Settlement Amount of $3.5 million, consisting of a $1.5 million Initial Payment from proceeds of the Chantilly Property already held by the Trustee, $1.0 million in monthly payments over thirty months, and a $1.0 million Final Payment; (ii) provide Pre-Hearing Schedules and related certifications before the Rule 9019 Hearing; (iii) provide pledge documents and related UCC-1 authorization materials; (iv) grant or confirm liens, security interests, and monitoring rights in favor of Plaintiffs, subject to the terms of the Agreement; (v) execute Stipulated Judgments in the amounts of $12 million and $20 million, respectively, to be used only as provided in the Agreement; (vi) provide stipulated facts declarations subject to the confidentiality and use restrictions in the Agreement; and (vii) release claims against the Trustee, the Estates, and MBL, including known and unknown claims.

Plaintiffs, in turn, agree to the staged covenant not to sue and release structure set forth in the Agreement. The Trustee and MBL will not release Defendants until the conditions in the Agreement have been satisfied, including receipt of all Settlement Payments and expiration of the Deadline to Pursue a Stipulated Judgment. The Agreement also addresses the pending appeal of the order approving the Trustee's settlement with MBL, dissolution of the preliminary injunction upon the Effective Date, dismissal of related state-court actions, and dismissal of the Adversary Proceeding after satisfaction of the Agreement's conditions.

*The foregoing is only a summary of the key terms of the proposed settlement. The actual terms of the proposed settlement are as set forth in the Agreement. Interested parties are encouraged to read the Agreement. To the extent there is any conflict between this summary and the Agreement, the Agreement controls.*

**PLEASE TAKE FURTHER NOTICE** that, in support of this Motion, the Trustee relies upon (i) the attached Memorandum of Points and Authorities, the Declarations of Hugh M. Ray, III and Peter J. Mastan, and the exhibits; (ii) the

concurrently filed notice of hearing on the Motion; (iii) the documents on file with the Court of which the Court is requested to take judicial notice; (iv) such further evidence that may be properly submitted prior to or at any hearing on the Motion; and (v) all matters of which the Court may take judicial notice.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Rule 9013-1(o) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "Local Rules"), the Trustee requests that the Court grant the Motion and approve the Agreement without a hearing, unless a hearing is requested by a party in interest. Pursuant to Bankruptcy Rule 2002(a)(3), a hearing to approve a compromise or settlement requires at least twenty-one (21) days' notice. Pursuant to Local Rule 9013-1(o)(1)(A)(ii), in conjunction with Bankruptcy Rule 2002(a)(3), any response and request for hearing must be (i) in writing and include a complete written statement of all reasons in opposition thereto or in support or joinder thereof, declarations and copies of all photographs and documentary evidence on which the responding party intends to rely and any responding memorandum of points and authorities, and (ii) **filed with the Clerk of the Court at 255 E. Temple St., Los Angeles, California 90012 and served no later than twenty-one (21) days after the date of service of Notice of this Motion on the following parties:**

For Filing with the Court:
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street
Los Angeles, CA 90012

For Service on the Defendants:
Maurice Salter, individually and as trustee of the Salter Family Trust, Aladdin Two, LLC, Emre Ucer, and Ucer, LLC
c/o Doug Flahaut
Echo Park Legal, APC
2210 W Sunset Blvd. #301
Los Angeles, CA 90026

<u>For Service on the Trustee</u>:
Peter J. Mastan, Trustee
c/o Hugh M. Ray, III
Pillsbury Winthrop Shaw Pittman LLP
609 Main Street, Suite 2000
Houston, TX 77002

<u>For Service on MBL</u>:
MBL Administrative Agent II LLC
c/o Andrew Cummings
Holland & Knight LLP
4675 MacArthur Court, Suite 900
Newport Beach, CA 92660

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Rule 9013-1(h), the failure to timely file and serve an opposition may be deemed by the Court to be consent to the granting of the relief requested in the Motion.

Dated: September 1, 2026 **PILLSBURY WINTHROP SHAW PITTMAN LLP**

By: *<u>/s/ Hugh M. Ray, III</u>*
Hugh M. Ray, III

*General Counsel for Peter J. Mastan, Chapter 7 Trustee*

# TABLE OF CONTENTS

Page


MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 5

- A. Prepetition Litigation and the Filing of the Bankruptcy Cases ..... 5
- B. The Defendants' Proofs of Claim ..... 6
- C. The Trustee's Settlement with MBL ..... 6
- D. The Trustee Created and Defended the Estates' Ability to Prosecute Their Claims ..... 7
- E. The Trustee Reconstructed the Case Despite the Missing Accounting Records ..... 8
- F. Emergency Enforcement Preserved the Principal Recovery Sources ..... 9
- G. Mediation Produced an Agreement in Principle ..... 10

III. SUMMARY OF SETTLEMENT AGREEMENT ..... 11

IV. STANDARD FOR APPROVAL OF A SETTLEMENT ..... 13

V. ARGUMENT ..... 13

- A. The Agreement Is the Product of the Trustee's Performance of His Core Statutory Duties and Must Be Evaluated as an Integrated Whole ..... 13
- B. The Probability-of-Success Factor Supports Monetizing a Strong but Fact-Intensive Case ..... 15
- C. The Agreement Addresses Collection Risk Before Judgment ..... 17
- D. The Litigation Is Factually, Legally, and Procedurally Complex, and the Estates Lack the Resources to Litigate Every Stage to Completion ..... 19
- E. The Agreement Materially Benefits Creditors on Both Sides of the Balance Sheet ..... 21
- F. The Adversarial and Mediated Process Further Confirms the Agreement's Reasonableness ..... 22

VI. CONCLUSION ..... 23

DECLARATION OF HUGH M. RAY, III ..... 25

DECLARATION OF PETER J. MASTAN, TRUSTEE ..... 33

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*In re A & C Properties*,
784 F.2d 1377 (9th Cir. 1986) .......... 13, 14, 20

*In re Blair*,
538 F.2d 849 (9th Cir. 1976) .......... 13

*Greif & Co. v. Shapiro (In re Western Funding Inc.)*,
550 B.R. 841 (B.A.P. 9th Cir. 2016), *aff'd*, 705 F. App'x 600 (9th Cir. 2017) .......... 14

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) .......... 14

*Spark Factor Design, Inc. v. Hjelmeset (In re Open Medicine Institute, Inc.)*,
639 B.R. 169 (B.A.P. 9th Cir. 2022) .......... 14

*In re W.T. Grant Co.*,
699 F.2d 599 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983) .......... 13

*In re Walsh Construction, Inc.*,
669 F.2d 1325 (9th Cir. 1982) .......... 13

Statutes and Codes

United States Code
Title 11, Section 7 .......... *passim*
Title 11, Section 704(a)(1), (4), (5) .......... *passim*

Rules and Regulations

Federal Rules of Bankruptcy Procedure
Rule 7012 .......... *passim*
Rule 9019 .......... *passim*

Federal Rules of Civil Procedure 12(b)(6) .......... 8

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Peter J. Mastan, the trustee (the "Trustee") of the jointly administered and substantively consolidated chapter 7 estates (the "Estates") of Moto Holding, LLC; Motolease Servicing, LLC; Motolease Funding, LLC; Pico Mobility, LLC; Westwood Group LLC; M-Nation, LLC; and MotoLease Titling Trust II (collectively, the "Debtors") in the above-captioned bankruptcy cases (the "Bankruptcy Cases") submits this Memorandum of Points and Authorities in support of his motion (the "Motion") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an order approving his settlement of the adversary proceeding styled *MBL Administrative Agent II LLC, et al. v. Salter, et al.*, Adv. Proc. No. 2:25-ap-01207-BB (the "Adversary Proceeding").

The Agreement resolves a substantial insider litigation dispute between the Trustee, on behalf of the Estates, and MBL Administrative Agent II LLC ("MBL," and together with the Trustee, the "Plaintiffs"), on the one hand, and Maurice Salter, individually and as trustee of the Salter Family Trust, Aladdin Two, LLC, Emre Ucer, individually, and Ucer, LLC (collectively, the "Defendants"),[1] on the other hand. The Plaintiffs and Defendants are collectively referred to herein as the "Parties." The Adversary Proceeding seeks relief based on, among other things, alleged fraudulent transfers, conversion, breach of fiduciary duties, civil conspiracy, substantive consolidation, claim objections, recharacterization, equitable subordination, and related theories. The claims are valuable, but they are also complex, fact-intensive, and likely to generate expensive discovery, forensic accounting, disputed expert testimony, motion practice, trial, and appeals.

The proposed settlement follows a substantial investigation and enforcement

[1] Focus Builders, Inc. was a defendant in the Adversary Proceeding, but the claims against Focus Builders, Inc. have been dismissed and not repleaded. Focus Builders, Inc. is not a party to the Agreement and is not included in the defined term "Defendants" for purposes of this Motion.

effort that materially improved the Estates' position.

When appointed, the Trustee assumed responsibility for seven affiliated chapter 7 estates without an unencumbered litigation war chest, with the final two years of critical accounting records unavailable, and with the Debtors' affairs intertwined with those of insiders and related non-debtor entities. The principal insiders also asserted $17,320,876.78 in claims against the same Estates they allegedly had harmed. MBL held separate direct claims and was pursuing its own remedies against the same limited asset base. Without immediate and coordinated action, the Estates faced three related risks: valuable claims they could not afford to prosecute, assets that could be transferred or further encumbered before judgment, and more than $17 million in insider claims competing with legitimate creditors for any recovery ultimately obtained.[2]

The Trustee and his counsel addressed those risks. They negotiated the Court-approved MBL Settlement, including financing and a joint-prosecution structure that gave an otherwise unfunded chapter 7 estate the ability to investigate and pursue its claims. Defendants contested and appealed that order. While defending it, the Trustee and counsel reconstructed the relevant transactions from a substantial volume of bank records, account-level data, third-party documents, communications, and other evidence despite the absence of the Debtors' final two years of accounting records. That work supported the detailed First Amended Complaint and enabled the Trustee to present a substantial case rather than allow missing books to become an excuse for inaction.[3]

When the investigation disclosed threats to the principal recovery sources, the Trustee acted promptly. After learning that Mr. Salter's residence, the Chantilly Property, had been offered for sale—and that a deed of trust had been executed and recorded against Mr. Ucer's residence, the Spalding Property, in December 2025 to secure Mr. Ucer's guaranty of a $3 million loan made by Sen Properties, Inc. to the

[2] Ray Decl. ¶¶ 5–8, 15–19; Mastan Decl. ¶¶ 5, 8–10.

[3] Ray Decl. ¶¶ 5–8; Mastan Decl. ¶¶ 5, 8, 10.

Debtors' affiliate RiderClub, LLC in May 2025—the Trustee moved for a preliminary injunction on January 21, 2026. Mr. Salter's discovery responses and document production did not disclose a sale contract. Counsel then learned from the public listing that the Chantilly Property was under contract, and the Trustee filed an emergency TRO motion on February 2. The Court conducted a hearing the next day and entered the TRO on February 4. The Trustee later obtained a preliminary injunction and negotiated court-approved controls under which the Chantilly Property sale closed while $1.5 million of the proceeds remained under the Trustee's control. Those enforcement efforts preserved value and leverage that made the present recovery possible.[4]

The Agreement improves both sides of the Estates' balance sheet. Defendants become jointly and severally obligated to pay $3.5 million, including $1.5 million—nearly forty-three percent of the Settlement Amount—already held by the Trustee. At the same time, Defendants release $17,320,876.78 in asserted insider claims. The Trustee does not contend that the elimination of disputed claims is equivalent to receiving that amount in cash, nor does he concede that the claims were valid. Their elimination nevertheless removes allowance risk, eliminates the expense of claim-objection litigation, prevents dilution of recoveries payable to legitimate creditors, and prevents the Defendants from recapturing through Estate distributions a portion of the value they are paying into the Estates. At face amount, the Agreement therefore produces a $20,820,876.78 gross shift in the Estates' assets-and-claims position before considering the value of the releases, security, information rights, and litigation avoided.[5]

Nor does the remaining $2 million rest on an unsecured promise or require the Estates to trust the Defendants' description of their finances. The Agreement was designed around the risks the Trustee's investigation revealed. Missing and incomplete records are answered by Pre-Hearing Schedules, certifications, supporting documents,

[4] Ray Decl. ¶¶ 9–12, 14; Mastan Decl. ¶¶ 7, 9.

[5] Ray Decl. ¶¶ 13–15, 18, 20; Mastan Decl. ¶¶ 8–12.

and continuing financial reporting. Dissipation risk is answered by read-only account access, liens and security interests, pledged interests, UCC authorizations, and limited spousal consents. Payment and covenant defaults are answered by the $12 million Stipulated Judgment procedures; a material misrepresentation concerning Defendants' financial condition is answered by the $20 million Representation and Warranty Default procedures; and possible discharge risk is addressed by stipulated facts preserving Plaintiffs' nondischargeability remedies. Defendants release the Trustee, the Estates, and MBL at the Effective Date, while Plaintiffs do not finally release Defendants until all payments have been made and the deadline for pursuing a Stipulated Judgment has expired. These protections are not ornamental. Each responds to a concrete risk the Trustee encountered.

The Agreement is also estate-centered. Although MBL holds direct claims and supplied the resources necessary to prosecute the litigation, every Settlement Payment is made to and through the Trustee for the Estates; the Agreement does not provide for Defendants to pay MBL directly. The recovery therefore remains within the bankruptcy process, under Court supervision and subject to administration under the Bankruptcy Code, rather than becoming the subject of a race among creditors to a limited and encumbered asset base. The Agreement also provides for dismissal of the appeal challenging the MBL Settlement, financing, and joint-prosecution structure; resolves the principal bankruptcy and state-court disputes among the Parties; and removes more than $17 million in insider competition from the claims pool.

The Court need not choose between confidence in the Trustee's claims and realism about collection. The investigation was substantial, the claims are serious, and the Trustee's enforcement efforts were effective. But a strong case does not guarantee a collectible net judgment. Continued litigation would require the Estates to prevail on the merits, defend that result on appeal, locate residual unencumbered value after prior secured claims, and then undertake an additional collection proceeding against Defendants whose assets and entities have already presented transparency and

dissipation concerns.

The Agreement converts preserved value and litigation leverage into $1.5 million already preserved, a defined additional payment stream, elimination of $17.3 million in insider claims, continuing financial visibility, collateral, joint-and-several liability, expedited default remedies, releases for the Estates, and resolution of the principal litigation. It is the culmination of investigation and enforcement, not a substitute for them.

## II. FACTUAL BACKGROUND

### A. Prepetition Litigation and the Filing of the Bankruptcy Cases

On October 30, 2023, MBL sued Messrs. Salter and Ucer and three of the Debtors for breach of contract in the Superior Court of the State of California for the County of Los Angeles (the "State Court"), Case No. 23STCV26454.[6]

On January 26, 2024, MBL sued Messrs. Salter and Ucer and five of the Debtors for fraud and fraudulent transfer in the State Court, Case No. 24STCV02135.[7]

On July 24, 2024, MBL moved for appointment of a receiver. Cummings Decl. ¶ 18. On August 14, 2024, the State Court issued a tentative ruling appointing a receiver.[8]

Later that same day, August 14, 2024 (the "Petition Date"), Moto Holding, LLC, Motolease Servicing, LLC, Pico Mobility, LLC, Motolease Funding, LLC, M-Nation, LLC, and Westwood Group LLC filed voluntary petitions under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Court"). On October 4, 2024, MotoLease Titling Trust II filed its voluntary chapter 7 petition.

The Trustee was appointed as chapter 7 trustee of each of the Estates. The Court

---

[6] Declaration of Andrew M. Cummings ¶ 3 [Main Case ECF No. 125-1] (the "Cummings Decl."). "Main Case ECF" citations refer to the lead bankruptcy case of Moto Holding, LLC, Case No. 2:24-bk-16517-BB. "Adv. Pro. ECF" citations refer to Adversary Proceeding No. 2:25-ap-01207-BB.

[7] Cummings Decl. ¶ 4.

[8] Cummings Decl. ¶ 20.

ordered joint administration of each of the Debtors' cases. On December 24, 2025, the Court ordered substantive consolidation of the assets and liabilities of each of the Estates and the assets and liabilities of non-debtor affiliate ML Portfolio, LLC.[9]

**B. The Defendants' Proofs of Claim**

On March 14, 2025, Mr. Ucer filed Claim No. 11 against the Moto Holding, LLC estate asserting a claim for $487,500.00, attached as **Exhibit 2**, and Mr. Salter filed Claim No. 12 against the Moto Holding, LLC estate asserting a claim for $16,833,376.78, attached as **Exhibit 3** (together, the "Defendants' Claims"). The Defendants' Claims are among the claims Defendants release under the Agreement, subject to entry of the Approval Order and the occurrence of the Effective Date, under Section 10.1 of the Agreement.

Although the Trustee disputes the validity and priority of the Defendants' Claims, disallowance or subordination was not assured. The documents supporting the claims reflect transfers into accounts of the Debtors or their affiliates, and counsel's analysis indicated that at least some of the transferred funds were used in their operations. The Trustee therefore faced a material risk that some or all of the claims could be allowed as general unsecured claims, diluting recoveries to other unsecured creditors by as much as $17,320,876.78.[10]

**C. The Trustee's Settlement with MBL**

On August 6, 2025, the Court approved a compromise and settlement between the Trustee and MBL, authorizing the Trustee to enter a joint prosecution agreement with MBL, allowing MBL's claim against the Estates, and authorizing postpetition financing for the Trustee to pursue the Estates' litigation claims[11] (the "MBL Settlement"). On August 20, 2025, Messrs. Salter and Ucer appealed the order

[9] Main Case ECF No. 181.

[10] Ray Decl. ¶ 15; Mastan Decl. ¶ 8.

[11] Main Case ECF No. 130.

approving the MBL Settlement,[12] commencing Civil Action No. 2:25-cv-09346-FLA in the United States District Court for the Central District of California. The Agreement also resolves the Parties' dispute regarding that appeal: the Parties will file a joint statement notifying the District Court that they have settled, subject to Bankruptcy Court approval, and, within fourteen days after the Effective Date, will file a stipulation dismissing the appeal.

### D. The Trustee Created and Defended the Estates' Ability to Prosecute Their Claims

The Trustee assumed administration of the Estates when they had virtually no unencumbered cash and no practical ability to finance complex insider litigation through judgment. At the same time, MBL possessed direct claims arising from overlapping conduct and had commenced litigation of its own. Rather than permit parallel litigation and a race to the same limited recovery sources, the Trustee and his counsel negotiated the MBL Settlement. By order entered August 6, 2025, the Court allowed MBL's claim, authorized financing for the Trustee, and approved a joint-prosecution agreement under which the Trustee and MBL could coordinate their direct and Estate claims.[13]

That structure was itself heavily contested. On August 20, 2025, Messrs. Salter and Ucer appealed the order approving the MBL Settlement, financing, and joint-prosecution agreement. They thereafter prosecuted that appeal while also contesting the Adversary Proceeding. The Trustee and counsel were therefore required to defend not only the Estates' claims but also the financing and prosecution agreements that made those claims economically viable. The appeal proceeded through briefing on the Trustee's renewed motion to dismiss and counsel's preparation for merits briefing before mediation produced a realistic path to settlement.[14]

[12] Main Case ECF No. 132.

[13] Main Case ECF No. 130; Ray Decl. ¶ 5; Mastan Decl. ¶ 5.

[14] Ray Decl. ¶¶ 5, 7–8, 11; Mastan Decl. ¶ 5.

The funds currently held in Estate accounts total $1,866,466.01, consisting of: (a) $136,253.87 segregated and potentially subject to liens, (b) $230,212.09 remaining from the MBL financing, and (c) $1,500,000.05 from the proceeds of the Chantilly Property sale.[15]

**E. The Trustee Reconstructed the Case Despite the Missing Accounting Records**

MBL commenced the Adversary Proceeding on June 5, 2025. Following approval of the MBL Settlement, the Trustee joined as a plaintiff in the First Amended Complaint filed September 16, 2025. The First Amended Complaint is 62 pages long, excluding exhibits, and asserts 18 overlapping causes of action arising from alleged prepetition and postpetition conduct involving multiple Debtors, insider-controlled entities, trusts, accounts, and transfers.

Developing those claims required substantially more than reviewing an ordinary debtor's books. The final two years of the Debtors' accounting records were unavailable. The Trustee and counsel accordingly reconstructed the relevant transactions through company emails, laptops obtained by the Trustee, East West Bank records, MBL collection and blocked-account records, Westwood, Pico, and M-Nation account records, loan and borrowing-base materials, communications, subpoenas, and documents provided by the Debtors' accountants and legal counsel. In total, the Trustee and the professionals he consulted obtained more than 5.7 terabytes of data and processed and culled approximately 1.3 million documents obtained from the Debtors and third-party sources.[16]

That reconstructed record cut both ways. It indicated that at least some of the funds underlying the Defendants' Claims were used by the Debtors or their affiliates in operations. It also supported allegations concerning, among other matters, allegedly falsified DACA and borrowing-base certificates, diversion of more than $4.9 million in

[15] Mastan Decl. ¶ 6.

[16] Ray Decl. ¶ 6.

collateral proceeds, insider transfers, the characterization of purported insider loans, disregard of entity separateness, and postpetition conduct.

Defendants and Focus Builders moved to dismiss under Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012. At the December 2, 2025 hearing, the Court granted the motions in part and denied them in part; its December 15 order allowed amendment of specified claims and directed the Parties to mediate.[17] Thus, material claims survived or could be amended, although factual and legal issues remained.[18]

**F. Emergency Enforcement Preserved the Principal Recovery Sources**

The Trustee's investigation continued while the pleadings and appeal were being litigated. Upon learning that Mr. Salter's residence, the Chantilly Property, had been offered for sale, the Trustee moved for a preliminary injunction on January 21, 2026.[19] Records obtained in connection with the motion also showed that a deed of trust had been executed on December 18 and recorded on December 31, 2025, against Mr. Ucer's residence, the Spalding Property. The deed purported to secure Mr. Ucer's guaranty of a $3 million loan made by Sen Properties, Inc. to RiderClub, LLC in May 2025.[20]

After Mr. Salter's discovery responses and document production failed to disclose a sale contract, counsel learned from the public listing that the Chantilly Property was under contract. With a continuing risk of further encumbrance or dissipation, the Trustee filed an emergency TRO motion on February 2, 2026.[21] The Court conducted the emergency hearing on February 3 and entered the TRO on February 4.[22] The elapsed time from motion to order was two days. The Court subsequently granted the preliminary-injunction motion on June 9 and entered the

[17] Adv. Pro. ECF No. 32.
[18] Ray Decl. ¶ 7.
[19] Adv. Pro. ECF No. 34.
[20] Ray Decl. ¶ 9.
[21] Adv. Pro. ECF No. 38.
[22] Adv. Pro. ECF No. 44.

preliminary injunction on June 15.[23]

Even then, success on the merits was not assured. Through stipulated orders, the Trustee maintained controls over the Chantilly and Spalding Properties, permitted the Chantilly Property sale to close under court-approved safeguards, and preserved $1.5 million in proceeds to fund the Initial Payment.[24] Those proceeds were not available to the Estates when the litigation began. They were identified, protected, and preserved through the Trustee's investigation and emergency enforcement.[25] The Agreement authorizes the Trustee to apply the $1.5 million in remaining sale proceeds for the Estates.

### G. Mediation Produced an Agreement in Principle

The Parties submitted mediation statements to the Honorable Lee R. Bogdanoff (Ret.) on February 16, 2026, and participated in an in-person mediation on February 25, 2026. After a full day of negotiations, the Parties reached agreement on the principal settlement terms late that evening.[26]

The agreement in principle did not end the Trustee's work. From March through August 2026, the Parties negotiated the definitive Agreement while the Trustee and counsel preserved the status quo through stipulated orders and continued to protect the proceeds and the Estates' litigation rights. The resulting Agreement contains detailed payment, disclosure, reporting, collateral, default, stipulated-judgment, nondischargeability, release, dismissal, and appeal provisions. Settlement documents were circulated for execution on August 17, 2026.[27]

Defendants, represented by experienced counsel, contested virtually every material step, including the MBL Settlement, the financing and joint-prosecution arrangement, the appeal, the motions to dismiss, the TRO, and the preliminary

---

[23] Adv. Pro. ECF Nos. 89, 93.

[24] Adv. Pro. ECF Nos. 65, 70, 76; Ray Decl. ¶ 12; Mastan Decl. ¶ 7.

[25] Ray Decl. ¶¶ 9–14; Mastan Decl. ¶¶ 7, 9.

[26] Ray Decl. ¶ 11; Mastan Decl. ¶ 4.

[27] Ray Decl. ¶¶ 12–14.

injunction. The Agreement therefore followed substantial investigation, contested litigation, emergency enforcement, judicial rulings, and an in-person mediation before an experienced neutral.

## III. SUMMARY OF SETTLEMENT AGREEMENT

Subject to Court approval, and on the terms set forth in the Agreement, the Parties are settling their respective disputes and exchanging releases. The Agreement is detailed, but its principal economic and protective terms include the following:

**First, Defendants are jointly and severally liable to pay the Estates $3.5 million.** The Settlement Amount consists of: (i) a $1.5 million Initial Payment from the sale proceeds of the Chantilly Property already held by the Trustee; (ii) thirty monthly payments aggregating $1.0 million; and (iii) a $1.0 million Final Payment due with the thirtieth monthly payment.

**Second, Defendants must provide extensive financial disclosures and monitoring rights.** Defendants must provide the Pre-Hearing Schedules before the Rule 9019 Hearing, provide certifications and supporting documents, maintain read-only account access, and provide periodic financial reporting and additional reporting as required by the Agreement. The Agreement separately provides that, if Defendants fail to timely and fully deliver the Pre-Hearing Schedules by the Pre-Hearing Schedules Deadline, and such failure is not excused by the death-or-incapacity provision, the Trustee may retain and apply the $1.5 million from the Chantilly Property sale proceeds as liquidated damages, without filing a Default Motion and without entry of a Stipulated Judgment.

**Third, the Agreement contains a negotiated default and Stipulated Judgment structure.** Defendants will execute a $12 million Stipulated Judgment for Payment Defaults and Covenant Defaults, and a $20 million Stipulated Judgment for Representation and Warranty Defaults. Payment Defaults may result in prompt entry of the Payment Default Stipulated Judgment as provided in the Agreement. Covenant Defaults and Representation and Warranty Defaults are subject to the contested-matter

procedures set forth in the Agreement.

**Fourth, the Agreement provides additional security for performance.** Defendants grant or confirm liens and security interests in favor of Plaintiffs, pledge certain Pledged Interests, deliver UCC-1 authorization materials and related documents, and agree to the Article VIII lien and perfection provisions. The Agreement also includes limited spousal consents as to community property interests in real property, and provides that the Approval Order shall be deemed to grant, attach, and perfect the liens and security interests described in the Agreement to the fullest extent permitted by applicable law.

**Fifth, the Agreement addresses nondischargeability and confidentiality.** Salter and Ucer will execute the stipulated facts declarations on nondischargeability attached to the Agreement as Exhibits C and D. Unless and until an Event of Default occurs, Plaintiffs may not file those declarations on the public docket or otherwise make them publicly available, subject to the Agreement's limited non-public disclosure provisions.

**Sixth, the Agreement resolves related litigation and claim disputes.** Defendants release the Trustee, the Estates, MBL, and related parties upon the Effective Date. Plaintiffs' release of Defendants is conditioned on receipt of all Settlement Payments and expiration of the Deadline to Pursue a Stipulated Judgment. The Agreement also provides for a joint statement in the pending appeal of the MBL Settlement order, dismissal of that appeal after the Effective Date, dissolution of the preliminary injunction upon the Effective Date, dismissal of related state-court actions without prejudice, and eventual dismissal of the Adversary Proceeding with prejudice after satisfaction of the Agreement's conditions.

***This document is only a summary of the key terms of the proposed settlement. The actual terms of the proposed settlement are as set forth in the Agreement. Interested parties are encouraged to read the Agreement. To the extent there is any conflict between this summary and the Agreement, the Agreement controls.***

## IV. STANDARD FOR APPROVAL OF A SETTLEMENT

The authority granted a trustee to compromise a controversy is set forth in Bankruptcy Rule 9019(a), which provides in relevant part that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." "A court may approve a compromise or settlement only when it is 'fair and equitable.'" *In re A & C Properties*, 784 F.2d 1377, 1383 (9th Cir. 1986) (citation omitted).

In determining whether a proposed settlement is fair and equitable, courts in the Ninth Circuit must consider the following factors:

(a) the probability of success in the litigation;

(b) the difficulties, if any, to be encountered in the matter of collection;

(c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it;

(d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*In re A & C Properties*, 784 F.2d at 1381 (quoting *In re Flight Transportation Corporation Securities Litigation*, 730 F.2d 1128, 1135 (8th Cir. 1984), *cert. denied*, 469 U.S. 1207 (1985)). A court is not "to decide the numerous questions of law and fact . . . but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 822 (1983) (citation omitted). A "mini-trial" on the merits of the underlying cause of action is not required and should not be undertaken. *In re Walsh Construction, Inc.*, 669 F.2d 1325, 1328 (9th Cir. 1982); *In re Blair*, 538 F.2d 849, 851–52 (9th Cir. 1976).

## V. ARGUMENT

### A. The Agreement Is the Product of the Trustee's Performance of His Core Statutory Duties and Must Be Evaluated as an Integrated Whole

The Bankruptcy Code directs a chapter 7 trustee to "collect and reduce to money" property of the estate as expeditiously as compatible with the interests of the parties, investigate the debtor's financial affairs, and examine and, where appropriate, object to proofs of claim. 11 U.S.C. § 704(a)(1), (4), (5). The Trustee performed each of those duties here. He investigated despite the absence of critical accounting records; reconstructed the transactions through other sources; created a funded prosecution structure; asserted and litigated the Estates' claims; acted immediately when recovery sources were threatened; preserved $1.5 million; and obtained the release of more than $17 million in insider claims.

The Court therefore should evaluate the Agreement as an integrated package, not by comparing only the $3.5 million Settlement Amount with the largest damages figure alleged in the pleadings. The proper comparison is between all consideration and protections obtained under the Agreement and the net, collectible reward likely to remain after continued litigation, appeal, senior liens, enforcement expense, and delay. See *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968); *Greif & Co. v. Shapiro (In re Western Funding Inc.)*, 550 B.R. 841, 851 (B.A.P. 9th Cir. 2016), *aff'd*, 705 F. App'x 600 (9th Cir. 2017) (the factors must be considered as a whole in comparing a settlement with the expected rewards of litigation).

*Spark Factor Design, Inc. v. Hjelmeset (In re Open Medicine Institute, Inc.)*, 639 B.R. 169 (B.A.P. 9th Cir. 2022), is also instructive. There, the BAP affirmed a compromise that combined $200,000 in immediate cash, contingent future value, and subordination of a $1.35 million insider claim. The BAP recognized that reducing the insider-claim pool supplied real value, particularly in a cash-poor estate facing voluminous and fact-intensive litigation. *Id*. at 173–76, 184 & n.5, 186–87 & n.6. The package here is considerably more substantial: $1.5 million already preserved, a $3.5 million joint-and-several payment obligation, complete release of $17,320,876.78 in insider claims, liens and pledges, continuing account access and reporting, and



53352028

enhanced remedies for default or material misrepresentation.

Measured as a whole, the Agreement comfortably satisfies each of the *A & C Properties* factors.

**B. The Probability-of-Success Factor Supports Monetizing a Strong but Fact-Intensive Case**

The Trustee is not seeking approval because the Estates' claims lack merit. They do not. Despite the absence of the final two years of accounting records, the Trustee and counsel reconstructed a substantial evidentiary record from bank, account-level, transactional, communication, and third-party sources. That investigation supported a 62-page First Amended Complaint asserting 18 causes of action. The Court granted Defendants' dismissal motions only in part, while allowing substantial portions of the dispute to proceed or be amended. The Trustee subsequently obtained a TRO on emergency notice and a preliminary injunction. Although those interlocutory rulings did not finally adjudicate the merits, they objectively demonstrate that the Estates' claims and dissipation concerns had substantial foundation.[28] Yet the Trustee is keenly aware of the risks to those claims and the uncertainties in proving them.

The Trustee's litigation position produced leverage, but it did not eliminate litigation risk. Continued prosecution would require the Plaintiffs to address further pleading challenges and then prove, among other matters, ownership and tracing of transferred funds, insolvency, actual or constructive fraudulent intent, fiduciary duties across multiple entities, the characterization of alleged insider "loans," the effect of disregarded entity separateness, damages, and the relationship between MBL's direct claims and the Estates' claims. The missing accounting records would make many of those issues more expensive and expert-intensive even though the Trustee successfully developed substantial alternative evidence.

The litigation history indicates that continued proceedings would be actively contested and likely protracted. Defendants contested the MBL Settlement, financing,

[28] Adv. Pro. ECF No. 7; Ray Decl. ¶¶ 2(g), 6–12; Mastan Decl. ¶¶ 7–8.

and joint-prosecution agreement; appealed the order approving them; moved to dismiss the First Amended Complaint; opposed emergency relief; and contested the preliminary injunction. Even if the Trustee prevailed on some claims, a trial judgment would not necessarily end the dispute. Post-trial motions, another appeal, and separate proceedings concerning ownership, priority, execution, and collection would remain likely.

The Court has already adjudicated motions to dismiss in part, and any Second Amended Complaint would generate further motion practice, extensive discovery, disputed factual records, expert testimony, trial, and potential appeals.[29] Even if Plaintiffs ultimately prevailed, the net recovery to the Estates would be reduced by the cost of that litigation and the delay inherent in reaching final judgment.[30] The documents supporting the Defendants' Claims reflect transfers into accounts of the Debtors or their affiliates, and counsel's analysis indicated that at least some of those funds were used in operations. That evidence created a material risk that some or all of the Defendants' Claims could be allowed.

The Agreement eliminates those risks while providing protections through the Stipulated Judgments, financial disclosures, reporting obligations, liens, pledge documents, and default remedies.[31] The Agreement therefore compares favorably to the expected rewards of continued litigation.[32]

Rule 9019 does not require the Trustee to prove that no larger judgment could ever be entered. Nor does it require the Estates to spend their recovery trying the case merely because the investigation produced strong claims. The relevant question is whether the Agreement compares favorably with the probable net reward after litigation risk, expense, delay, appeal, and collection. It does. The Agreement monetizes the strength of the Estates' claims now, before that strength can be consumed by the cost

[29] Ray Decl. ¶¶ 7, 19; Mastan Decl. ¶¶ 8, 10.
[30] Ray Decl. ¶ 19; Mastan Decl. ¶ 10.
[31] Ray Decl. ¶¶ 13, 18, 20; Mastan Decl. ¶¶ 9, 11.
[32] Mastan Decl. ¶¶ 9–12.

of proving and collecting them.

### C. The Agreement Addresses Collection Risk Before Judgment

Collection is not a hypothetical concern in this case. During the litigation, the Trustee learned that the Chantilly Property had been offered for sale and later placed under contract. He also learned that a deed of trust had been executed and recorded against the Spalding Property in December 2025, purporting to secure Mr. Ucer's guaranty of a $3 million loan made by Sen Properties, Inc. to the Debtors' affiliate RiderClub, LLC in May 2025. The Trustee was required to obtain emergency relief to prevent further transfer, encumbrance, or dissipation. That experience supplies a concrete basis for collection concerns beyond speculation about what a judgment creditor might encounter years from now.[33]

Moreover, the Defendants' apparent asset values are not equivalent to unencumbered equity available to satisfy a judgment in favor of the Estates. The properties and other assets identified in the investigation and financial disclosures were subject to existing mortgages and other asserted secured claims. A judgment in favor of the Estates would not prime valid senior liens, and litigating the validity or priority of disputed liens would add cost and delay. The Estates could collect only from value remaining after valid secured debt, disposition expenses, ownership disputes, and enforcement costs. A forced sale could therefore produce materially less for the Estates than headline asset values suggest.[34]

The Agreement materially mitigates that risk. First, the Trustee already holds $1.5 million, which is not subject to the uncertainty of a later judgment on the merits or a future collection process. Second, Defendants are jointly and severally liable for the entire $3.5 million obligation, expanding the available payment sources and eliminating the need to allocate liability among them before enforcement. Third, the 30-month payment structure captures future liquidity that may not exist as present equity and that

[33] Ray Decl. ¶¶ 9–12, 16–18; Mastan Decl. ¶¶ 7, 9.

[34] Ray Decl. ¶¶ 16–17; Mastan Decl. ¶ 9.

a forced liquidation behind senior liens could destroy.

Fourth, the Agreement moves the Trustee inside the information loop. Pre-Hearing Schedules, certifications, and supporting documents allow the Trustee and the Court to test Defendants' financial presentation before approval. Continuing reports and read-only account access create an early-warning system during the payment period. The obligation to provide additional information permits the Trustee to investigate adverse changes before value disappears. Information rights of this kind are themselves collection assets because they reduce the time between a warning sign and enforcement.

Fifth, liens, security interests, pledged interests, UCC authorizations, and limited spousal consents provide additional enforcement protection to the fullest extent permitted under the Agreement and applicable law. The Trustee does not contend that these interests prime every existing lien or eliminate every perfection issue. They nevertheless place the Plaintiffs in a materially better position than holders of an unmonitored general judgment entered years later.

Finally, the $12 million and $20 million Stipulated Judgment procedures materially streamline the consequences of payment, covenant, or representation-and-warranty defaults. Those are enhanced contractual remedies (not guaranteed recoveries) and remain subject to the Agreement's procedures and the value available for collection. But they preserve substantial leverage and avoid requiring the Plaintiffs to restart the underlying merits litigation if Defendants fail to honor the bargain or materially misstate their financial condition. The stipulated-facts declarations similarly preserve nondischargeability evidence and remedies if a bankruptcy filing follows a default.

The Agreement reduces the Estates' dependence on Defendants' representations by providing financial transparency and enforceable remedies. In practical terms, the Trustee compromised two disputes: the merits litigation and the collection litigation that likely would have followed. This structure reduces the risk that Plaintiffs could obtain a substantial judgment only after years of litigation and then incur additional time and

expense attempting to collect it.[35]

**D. The Litigation Is Factually, Legally, and Procedurally Complex, and the Estates Lack the Resources to Litigate Every Stage to Completion**

The Court is asked to take judicial notice of the complexity of this case and the proceedings in it. The complexity here has three separate dimensions.

First, the facts are unusually difficult. The final two years of accounting records were unavailable. The Debtors' and related entities' finances allegedly were intertwined through multiple accounts, purported insider loans, personal charges, shared vendors, intercompany transfers, trusts, and insider-controlled entities. The Plaintiffs would need to reconstruct and trace years of transactions through multiple East West Bank accounts, MBL collection and blocked accounts, and accounts associated with Westwood, Pico, M-Nation, Ucer LLC, Salter, and other recipients.[36] They also would have to litigate allegations concerning DACA and borrowing-base certificates, diversion of more than $4.9 million in collateral proceeds, prepetition transfers, and postpetition conduct.[37] Those issues require extensive third-party discovery and likely forensic and damages experts.

Second, the legal issues overlap. The First Amended Complaint asserts direct MBL claims and Estate claims involving fiduciary duties, fraud, conversion, fraudulent transfers under federal and state law, turnover, preferences, postpetition transfers, substantive consolidation, partnership and entity-separateness theories, claim objections, recharacterization, and equitable subordination, which would be complex to prove.[38] The Parties dispute ownership, intent, solvency, tracing, characterization of debt, and the legal consequences of operating through multiple Debtor and non-debtor entities.

---

[35] Ray Decl. ¶¶ 13, 16–20; Mastan Decl. ¶¶ 9–12.

[36] *See* Exhibit 4 ¶¶ 40–61, 78–103.

[37] Exhibit 4 ¶¶ 57–61, 78–99, 100–103.

[38] Exhibit 4 ¶¶ 6–7, 90–103, 111–113, 115–262.

Third, the procedural dispute extends well beyond a single trial. The controversy already spans the main bankruptcy cases, the Adversary Proceeding, an appeal in the District Court, related state-court actions, dismissal proceedings, emergency TRO proceedings, preliminary-injunction litigation, subpoenas, and numerous preservation orders. Continued litigation would require an amended pleading, further motion practice, fact and expert discovery, dispositive motions, trial, likely appeal, and collection proceedings. Given Defendants' established willingness to contest material issues, those stages are not remote possibilities; they are the most probable course of continued litigation.

The discovery, motion practice, trial, and potential appeals necessary to resolve those issues would impose substantial expense on the Estates and delay any meaningful distribution to creditors.[39] The Adversary Proceeding has already required motion-to-dismiss practice, emergency TRO proceedings, preliminary-injunction proceedings, and multiple stipulated preservation orders.[40] Continued litigation would increase those costs and delays.[41] The proposed settlement avoids those risks, costs, and delays while providing a structured resolution of the litigation.[42]

The cost matters because these chapter 7 Estates have virtually no unencumbered cash. Based on the work already required and the remaining case stages, counsel estimates that fees and expenses through trial would easily exceed seven figures, excluding any appeal or collection proceedings.[43] Without the MBL financing structure, the Estates could not have prosecuted litigation of this magnitude at all. Even with financing, every additional litigation dollar would reduce the value available for administration and distribution. *A & C Properties* recognizes that prolonged litigation and appeals can themselves become asset-wasting. 784 F.2d at 1384.

---

[39] Ray Decl. ¶ 19; Mastan Decl. ¶ 10.

[40] Ray Decl. ¶¶ 7, 9–12.

[41] Ray Decl. ¶ 19; Mastan Decl. ¶ 10.

[42] Ray Decl. ¶¶ 13–20; Mastan Decl. ¶¶ 9–12.

[43] Ray Decl. ¶ 19; Mastan Decl. ¶ 10.

### E. The Agreement Materially Benefits Creditors on Both Sides of the Balance Sheet

The creditor benefit should be measured in at least four categories.

First, the Agreement adds assets. Defendants are jointly and severally obligated to pay $3.5 million, of which $1.5 million is already held by the Trustee. The remaining $2 million is payable over a defined 30-month period and is supported by continuing disclosure, monitoring, collateral, and default remedies. That timing compares favorably with the time required to amend the pleadings, complete discovery, try the case, defend a judgment on appeal, and commence collection.

Second, the Agreement removes claims. Defendants' Claims of approximately $17 million are released. Although the proofs of claim are not formally deemed withdrawn until the Agreement's performance and dismissal conditions have been completed, the Approval Order shall make explicit that those released claims are not entitled to allowance or distribution during the intervening period. Their elimination prevents dilution of legitimate claims, removes the cost and uncertainty of claim-objection litigation, and prevents the circular result in which Defendants could recover through distributions a portion of the money they are paying into the Estates.

Third, the Agreement avoids litigation costs and risks. It resolves the principal disputes in the Adversary Proceeding, provides for dismissal of the appeal attacking the MBL Settlement and prosecution structure, addresses the related state-court proceedings, and eliminates the need for postjudgment asset discovery and execution litigation if Defendants perform. It also provides releases to the Trustee, the Estates, and MBL at the Effective Date, reducing contingent exposure and administrative uncertainty.

Fourth, the Agreement supplies controls that a conventional cash compromise would not. The Pre-Hearing Schedules permit the Trustee to test whether the Agreement is the best presently collectible result before the Rule 9019 hearing. Supporting documents, certifications, read-only account access, and continuing reports allow

ongoing verification. Liens, pledges, UCC authorizations, spousal consents, default remedies, and stipulated facts protect the Estates if the financial presentation is incomplete, future performance deteriorates, or Defendants seek bankruptcy protection.

The estate-centered payment structure is an additional and important benefit. MBL holds direct claims and financed the prosecution, yet every Settlement Payment is made to and through the Trustee rather than directly to MBL. The recovery remains subject to centralized administration, Court supervision, and the Bankruptcy Code's distribution process. That structure avoids a private race to the same limited assets and ensures that the Trustee, rather than an individual creditor pursuing separate remedies, controls the recovery for the benefit of the Estates.

The release structure likewise preserves the Estates' leverage. Defendants release the Trustee, the Estates, and MBL upon the Effective Date. Plaintiffs' release does not become effective until all Settlement Payments have been received and the deadline to seek a Stipulated Judgment has expired. The Estates thus receive immediate peace from Defendants' Claims without surrendering their own remedies before performance.

Taken together, the Agreement provides cash in hand, a monitored additional payment stream, elimination of insider competition, releases for the Estates, collateral, information rights, remedies, and comprehensive resolution of the principal disputes. That package serves the paramount interests of creditors.

**F. The Adversarial and Mediated Process Further Confirms the Agreement's Reasonableness**

The substantive benefits independently satisfy Rule 9019. The negotiation process reinforces that conclusion.

This was not a settlement reached before the Trustee knew the case. It followed extensive investigation, a detailed amended complaint, contested dismissal motions, an appeal, emergency discovery, a TRO obtained within two days, a preliminary injunction, and multiple orders preserving the relevant property and proceeds. Defendants were represented by experienced counsel and contested virtually every

material issue.

The Parties then participated in Court-directed mediation before the Honorable Lee R. Bogdanoff (Ret.), exchanged mediation statements, and negotiated in person for a full day before reaching agreement in principle late that evening. They spent the ensuing months negotiating definitive documents while preserving the status quo. The final Agreement's detailed financial-disclosure, monitoring, collateral, default, release, and enforcement provisions reflect that sustained adversarial process. The Trustee and his counsel had investigated the merits, experienced the collection risks, litigated against Defendants, and evaluated the appeal before recommending the compromise.

The Agreement therefore represents an informed exercise of the Trustee's business judgment after the claims, defenses, and collection risks had been substantially investigated and tested through contested proceedings—not a concession made because the Estates lacked confidence in their case.

## VI. CONCLUSION

The Agreement falls well within the range of reasonableness. It provides a structured result for Estates that began with no practical litigation war chest, missing accounting records, complex insider and intercompany transactions, threatened recovery sources, and $17 million in claims.

The Trustee and his counsel created a viable prosecution structure, defended it on appeal, reconstructed the case through alternative evidence, acted immediately when assets were threatened, obtained emergency and preliminary injunctive relief, preserved $1.5 million, and converted that leverage through mediation into a $3.5 million joint-and-several payment obligation, elimination of $17,320,876.78 in insider claims, releases for the Estates, continuing financial visibility, collateral, and enforcement remedies. Every Settlement Payment flows through the Estates rather than outside the bankruptcy process.

The settlement reflects that investigation and enforcement. It converts a strong but expensive case and an uncertain future collection process into cash in hand, a

protected payment stream, claim-pool relief, and comprehensive resolution of the principal disputes. The Court should approve the Agreement and grant the related relief requested in the Motion.

Dated: September 1, 2026

Respectfully submitted,

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

By: */s/ Hugh M. Ray, III*
Hugh M. Ray, III (*pro hac vice*)
hugh.ray@pillsburylaw.com
L. James Dickinson (*pro hac vice*)
james.dickinson@pillsburylaw.com
609 Main Street, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7673

*General Counsel for Peter J. Mastan, Chapter 7 Trustee*